# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 08-1101 RB |
| | ) | |
| AXEL JOVAN YESCAS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND ORDER DENYING MOTION TO SUPPRESS

**THIS MATTER** came before the Court on Defendant's Motion to Suppress Physical Evidence and Statements [Doc. 41], filed on June 17, 2008. The Court held a hearing on this motion on August 5, 2008. Having considered the submissions of counsel, testimony, relevant law, and being otherwise fully advised, I issue these findings of fact and conclusions of law and deny Defendant's motion.

## FINDINGS OF FACT

1.      The Indictment charges Defendant with conspiracy to possess with intent to distribute 100 kilograms and more of marijuana, in violation of 21 U.S.C. § 846.

2.      On June 3, 2008, the Co-Defendant, Manolo Peralta, pleaded guilty. Mr. Peralta is set to be sentenced by The Honorable John E. Conway, United States District Judge, on August 18, 2008, in the case styled *United States v. Peralta*, and numbered CR 08-1223 JC.

3.      Defendant is set for call of the calendar on September 2, 2008, and jury trial on the September 15, 2008 trailing docket.

4.      Defendant filed his motion to suppress on June 17, 2008, contending that the roving

patrol stop of the vehicle driven by Defendant was not justified at its inception and, thus, violated the Fourth Amendment.  The Government filed its Response on July 1, 2008, asserting that the agents had reasonable suspicion to stop Defendant.

5.      In the early morning hours of February 20, 2008, Supervisory United States Border Patrol Agent Jose Portillo was on duty at the United States Border Patrol Station located in Lordsburg, New Mexico.

6.      Supervisory Agent Portillo has served as a Border Patrol Agent since 1997.  He was promoted to supervisory agent approximately one year ago.  Throughout his Border Patrol career, Supervisory Agent Portillo has worked in the bootheel area of southwest New Mexico.

7.      On February 20, 2008, at approximately 2:00 a.m., Supervisory Agent Portillo heard, via an official Border Patrol radio transmission from a Forward Looking Infrared Radar (herein "FLIR") operator deployed near the Quincy Exit (herein "Exit 55") of Interstate 10, that two eastbound sport utility vehicles displaying Arizona license plates had left Interstate 10 at Exit 55, turned around and proceeded westbound on Interstate 10.

8.      FLIR is used to detect body heat of persons and animals walking through the desert. The FLIR operator was using a FLIR unit to search for persons in the desert south of Exit 55.  The FLIR antenna was mounted on a mast attached to a truck, which was parked just south of Exit 55. The truck, which displayed no external lights, would not have been apparent to drivers using Exit 55.  The FLIR operator was aware of the patterns of operations used by individuals engaged in the transport of illegal aliens or drugs.

9.      When the FLIR operator perceived headlights coming up the ramp of Exit 55, the FLIR operator turned his head away from the FLIR monitor and saw two vehicles exit the eastbound lanes of Interstate 10 at Exit 55.  One vehicle was a black Chevy Tahoe.  The other vehicle was a

copper-colored crossover vehicle.  Both vehicles displayed Arizona license plates.  At the top of the ramp, the vehicles turned left, crossed the overpass, and turned left on the ramp to enter Interstate 10 westbound.

10.     Exit 55 is located near the 55 mile marker on Interstate 10.  Mile markers on Interstate 10 are sequentially numbered from west to east and, in New Mexico, mile marker numbering begins at zero at the Arizona state line.  Mile markers are used to determine exit numbers.  No facilities, or services, are located at Exit 55.  The south side of Exit 55 connects to a frontage road that leads to a rest area and a Dairy Queen located approximately six miles to the east of Exit 55.  The Dairy Queen may be accessed from a more direct exit to the east of Exit 55.  The Dairy Queen closes daily at 6:00 p.m.  The north side of Exit 55 connects to a road to private property.

11.     In Agent Portillo's experience, Exit 55 is typically used by individuals engaged in the transport of illegal aliens or drugs.  In fact, Agent Portillo has never observed legitimate traffic use Exit 55 during the early morning hours around 2:00 a.m.  Typically, individuals engaged in the transport of illegal aliens or drugs drive eastbound on Interstate 10 from Arizona and pick up loads of illegal aliens or drugs on the south side of the eastbound lanes of Interstate 10 at mile marker 45.

12.     Located about 30 miles as the crow flies from the international border, mile marker 45 on eastbound Interstate 10 offers a useful rendezvous point for individuals engaged in transporting illegal aliens or drugs.  The popularity of the mile marker 45 site, which lies at a bend in Interstate 10, may be attributed to its proximity to an unused railroad trestle that intersects Interstate 10, as well as a cell tower located approximately two miles to the west near Separ, New Mexico.  The railroad trestle is visible to drivers approaching on Interstate 10 from a distance of at least three miles.  A blinking red light on the top of the cell tower is visible to persons approaching

on foot from the border area to the south for a distance of at least 10 miles. Illegal aliens and/or backpackers carrying illegal drugs typically cross the border on foot and walk north across the desert to Interstate 10. The terrain in the vicinity of mile marker 45 consists of flat desert with low hills about ten to fifteen miles to the south. For an eastbound vehicle at mile marker 45, the first opportunities to turn around and go west are at Exit 49 and Exit 55.

13.     The area around Exit 55, as it appears during daylight hours in late July or early August 2008, is depicted in Government Exhibits 2 through 6, inclusive. The Court takes judicial notice that the area, as depicted in Government Exhibits 2 through 6, inclusive, appears unusually verdant due to heavy rains from the summer monsoon season. Most of the time, including on February 20, 2008, the area is parched. The Court further notes that the events in question occurred during the early hours of the morning. The area, as depicted in Government Exhibits 2 through 6, inclusive, differs from the area as it appeared during the events in question because Government Exhibits 2 through 6, inclusive, depicts the area in the sunlight while the events in question occurred in the dark of night.

14.     On February 20, 2008, Supervisory Agent Portillo was personally aware of at least 100 seizures of illegal drugs or aliens that involved vehicles picking up illegal aliens or drugs on the south side of Interstate 10 near mile marker 45, including eight in the month prior to February 20, 2008, involving vehicles with Arizona plates that turned around at Exit 55. Supervisory Agent Portillo obtained this knowledge from his training and experience, as well as through briefings held at the beginning of each shift at the Lordsburg Border Patrol Station wherein agents regularly share information concerning recent seizures and tactics used by individuals engaged in the transport of illegal aliens and drugs.

15.     The circumstances of the prior seizures involved two vehicles driving in tandem

4

consisting of a scout, or "heat," vehicle and a load vehicle.  Typically, the scout and the load vehicles drive in tandem, which refers to the practice of driving a few car lengths apart while the drivers maintain contact by cell phone or radio.  In the event law enforcement follows a tandem vehicle pair, the scout vehicle may drive erratically in order to draw the "heat," i.e., the attention of law enforcement, from the load vehicle.  The vehicles involved in the earlier seizures were typically registered to addresses located in Phoenix or Tucson, Arizona.

16.     Based on his prior knowledge gained though his training, experience, and the information gained at pre-shift briefings, the report from the FLIR operator concerning two vehicles turning around at Exit 55 immediately aroused the suspicions of Supervisory Agent Portillo.

17.     Immediately upon hearing the report from the FLIR operator, Supervisory Agent Portillo determined by radio that United States Border Patrol Agent Jesus Soto and United States Border Patrol Agent Luis Garcia were on roving patrol duty northbound on Highway 146, a few miles south of Interstate 10 en route from Hachita, New Mexico to Lordsburg.

18.     Agents Soto and Garcia, who were driving separate United States Border Patrol vehicles, had also heard the radio transmission from the FLIR operator concerning the two vehicles that turned around at Exit 55.  Agents Soto and Garcia attended the briefings held at the beginning of each shift at the Lordsburg Border Patrol Station, wherein agents regularly share information concerning recent seizures and tactics used by individuals engaged in the transport of illegal aliens and drugs.  Agent Soto has over two years of experience with the Border Patrol.  Based on knowledge gained through training, experience, and briefings, Agents Soto and Garcia were aware of the use of mile marker 45 and Exit 55 by persons engaged in the transport of illegal aliens and drugs and the significance of two vehicles with Arizona plates turning around at Exit 55.

19.     Supervisory Agent Portillo directed Agents Soto and Garcia to proceed to the Exit

5

49 overpass and wait for the Tahoe and the crossover vehicle.  Agent Portillo left the Lordsburg

station, jumped into a United States Border Patrol vehicle and started driving east on Interstate 10.

Supervisory Agent Portillo wanted to be available for officer safety purposes and to deploy a spike

strip, if necessary.  Agent Portillo parked in the median of Interstate 10, near mile marker 33, and

waited.

      20.     Agents Garcia and Soto parked on the westbound entrance ramp of Exit 49, ready

to enter the westbound lanes of Interstate 10.  About five minutes after Agent Portillo radioed them,

Agents Garcia and Soto observed the black Tahoe proceeding west on Interstate 10.  The elapsed

time was consistent with the time required for a vehicle to travel from Exit 55 to Exit 49.

      21.     Agent Soto pulled onto Interstate 10 and followed the Tahoe.  A few minutes later,

Agent Garcia followed the second vehicle, which was a copper-colored Ford Edge.

      22.     Agent Soto requested a stolen-vehicle and 72-hour-lane checks on the Tahoe.  The

checks came back negative, *i.e.*, the Tahoe was not stolen and had not crossed through a port of

entry within the prior 72 hours.  The Tahoe was registered to an address in Tucson, Arizona.

      23.     As Agent Soto followed the Tahoe for fifteen miles between Exit 49 and mile marker

34, the Tahoe swerved within its lane and sped up and slowed down.  The speed of the Tahoe varied

dramatically; the Tahoe traveled at speeds from 55 mph to almost 80 mph.  The driver turned on his

turn signal, but did not pull over.  In Agent Soto's experience, swerving within a lane and changes

in velocity are consistent with driver nervousness and/or an indication that the driver is about to bail

out, *i.e.*, pull over and flee on foot.  Agent Soto shared this information with Supervisory Agent

Portillo via radio transmissions.

      24.     Agent Soto could not see the driver because the windows on the Tahoe were tinted.

In his rearview mirror, Agent Soto could see the headlights of the crossover and Agent Garcia's

vehicle as Agent Garcia followed the crossover about 100 yards behind Agent Soto's position.  The only other traffic in the westbound lanes of Interstate 10 was a passing semi-truck.

25.     Agent Portillo directed Agent Soto to wait to pull over the Tahoe until Agent Soto and the Tahoe were closer to Supervisory Agent Portillo's position at mile marker 33.  Based on officer and public safety concerns, as well as to maintain a tactical advantage, Supervisory Agent Portillo believed that the area around the 33 mile marker represented the best place to end the pursuit.  Mile marker 33 is located approximately ten miles east of the town of Lordsburg.  Traffic was very light on Interstate 10 at that hour and Supervisory Agent Portillo was available to assist and deploy a spike strip, if necessary, to avert the possibility of a high speed chase in, or around, Lordsburg.

26.     At approximately the 34 mile marker, Agent Soto turned on his flashing police lights to stop the Tahoe.  The driver complied and pulled to the side of Interstate 10 between the 34 and the 33 mile markers.  Agent Soto approached the driver and spoke to the driver in English and Spanish.  Agent Soto identified Defendant as the driver of the Tahoe.  Defendant was the driver and sole occupant of the Tahoe. After making contact with Defendant, Agent Soto placed Defendant in the back of Agent Soto's Border Patrol vehicle.  The Tahoe contained no illegal aliens or drugs.

27.     Agent Garcia turned on his flashing police lights to stop the Edge.  After rolling on the shoulder of the road, the Edge came to a stop; two individuals immediately jumped out and fled on foot.  Supervisory Agent Portillo ran to the scene, saw bundles inside the Edge that appeared identical to recently-seized bundles of marijuana, and smelled like marijuana.  Supervisory Agent Portillo ordered Agent Garcia to stay with the Edge while Supervisory Agent Portillo chased the suspects on foot in the desert.

28.     After the FLIR operators and a canine unit arrived on the scene, one of the

7

individuals who fled from the Edge was apprehended in the desert.  The other individual who fled

the Edge alluded capture.  The suspects, the Tahoe and the Edge were transported to Lordsburg.  The

bundles in the Edge contained marijuana.

29.    The testimonies of Supervisory Agent Portillo and Agent Soto were fully credible.

The testimony of Supervisory Agent Portillo conflicted with the testimony of Agent Soto concerning

whether Agent Soto could see the driver of the Tahoe and whether the Tahoe swerved outside of its

lane as Agent Soto followed the Tahoe on Interstate 10.  I find these discrepancies are attributable

to the fact that Agent Soto was the eyewitness to the events and Supervisory Agent Portillo testified

based on his recollection as to what Agent Soto related to Supervisory Agent Portillo over five

months before the hearing.  To the extent the testimony of Supervisory Agent Portillo conflicted

with the testimony of Agent Soto, I find the testimony of Agent Soto to be more reliable.

## CONCLUSIONS OF LAW

1.    The Fourth Amendment prohibits unreasonable searches and seizures by the

Government.  U.S. Const. amend. IV.  A traffic stop is valid under the Fourth Amendment when

probable cause or reasonable suspicion exists.  *United States v. Valenzuela*, 365 F.3d 892, 896-97

(10th Cir. 2004) (probable cause standard); *United States v. Cheromiah*, 455 F.3d 1216, 1220-

21(10th Cir. 2006) (reasonable suspicion standard); *United States v. Gandara-Salinas*, 327 F.3d

1127, 1129 (10th Cir. 2003) (same).

2.    "Border Patrol agents on roving patrol are permitted 'to stop vehicles only if they are

aware of specific articulable facts, together with rational inferences from those facts, that reasonably

warrant suspicion' that the occupants are involved in criminal activity."  *Cheromiah*, 455 F.3d at

1220 (quoting *United States v. Cantu*, 87 F.3d 1118, 1120 (10th Cir. 1996) and *United States v.

Brignoni-Ponce*, 422 U.S. 873, 884 (1975)).  Reasonable suspicion does "not rise to the level

required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). It "represents a 'minimum level of objective justification.' " *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

       3.      In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including:

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*Cheromiah*, 455 F.3d at 1220-21; (*citing United States v. Monsivais*, 907 F.2d 987, 989-90 (1990) and *Brignoni-Ponce*, 422 U.S. at 884-85); *see also United States v. Holguin-Chavez*, 2008 WL 2127848 (May 20, 2007) (unpublished).

       4.      In evaluating these factors, a court may not employ a "divide-and-conquer" approach by evaluating and rejecting each factor in isolation. *Arvizu*, 534 U.S. at 277. The ultimate determination of reasonable suspicion depends upon the totality of the circumstances. *Cheromiah*, 455 F.3d at 1221. A border patrol officer may use his experience and training in detecting illegal entry and smuggling when assessing these factors. *Gandara-Salinas*, 327 F.3d at 1129. A court must defer to the officer's ability to distinguish between innocent and suspicious actions. *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277-78 (10th Cir. 1998).

       5.      A review of the totality of the circumstances establishes that Supervisory Agent Portillo and Agent Soto had reasonable suspicion to stop the Tahoe.

       6.      The agents heard, via an official Border Patrol radio transmission from a FLIR

operator, that two eastbound sport utility vehicles displaying Arizona license plates had left eastbound Interstate 10 at Exit 55, turned around and proceeded westbound on Interstate 10.

7.    Defendant objected to this testimony on the basis of hearsay.  It is clear, however, that hearsay testimony is admissible at a suppression hearing as long as it bears sufficient indicia of reliability.  *United States v. Yarbrough*, 527 F.3d 1092, 1099 (10th Cir. 2008) (citing *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004)).  *See also United States v. Matlock*, 415 U.S. 164, 173 (1974) (rules of evidence applicable in criminal jury trials do not govern at hearings before a judge to determine pre-trial evidentiary matters, such as the admissibility of evidence at trial). *See* Fed. R. Evid. 104(a) (preliminary questions concerning the admission of evidence are to be determined by the court).  The testimony of the agents as to the contents of an official Border Patrol radio transmission is clearly reliable and, therefore, admissible to determine whether the stop was supported by reasonable suspicion.

8.    The ultimate determination of reasonable suspicion depends upon the totality of the circumstances.  *Cheromiah*, 455 F.3d at 1220-21.  The following factors are relevant in determining whether the stop of the Tahoe was supported by reasonable suspicion: (1) The Tahoe matched the description, relayed by the FLIR operator, of one of the vehicles that turned around at Exit 55; (2) two vehicles traveling in tandem, exiting at Exit 55 is suspicious at any time but all the more so at 2:00 a.m. (3) persons engaged in the transport of illegal aliens or drugs typically turn around at Exit 55, which is located in a remote area and has no facilities available to travelers; (4) the area of Interstate 10 between mile marker 45 and Exit 55 is commonly utilized by persons engaged in the transport of illegal drugs and aliens; (5) the area in question is less than 35 miles from the international border; (6) the Tahoe and the Edge appeared to be driving in tandem; (7) both vehicles displayed Arizona license plates; (8) the Tahoe was registered to an address in Tucson, Arizona; (9)

as Agent Soto followed the Tahoe, the driver of the Tahoe swerved within his lane, the speed of the Tahoe varied dramatically, and the driver of the Tahoe turned on his turn signal, but did not pull over. These factors, considered under the totality of the circumstances, establish that Agent Soto had reasonable suspicion to believe that the driver of the Tahoe was engaged in illegal activity. Thus, Agent Soto had reasonable suspicion to stop the Tahoe. *See Cheromiah*, 455 F.3d at 1220-21.

9.     In his motion, Defendant attempts to distinguish and explain each factor. In essence, Defendant invites the Court to evaluate and reject each factor in isolation; an approach specifically prohibited by *Arvizu*. *See Cheromiah*, 455 F.3d at 1220-21. In *Arvizu*, the Supreme Court reiterated what it had already established in *Terry v. Ohio*, 392 U.S. 1, 22, (1968), specifically, that "each of [a] series of acts," though "perhaps innocent in itself," may justify "further investigation" when viewed as a whole. *Arvizu*, 534 U.S. at 274-75 (quotation marks omitted). The nine factors identified above, while perhaps innocent in isolation, were sufficient to generate reasonable suspicion of criminal activity when considered together. Based on the totality of the circumstances, the stop of the Tahoe was supported by reasonable suspicion.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Physical Evidence and Statements [Doc. 41], filed on June 17, 2008, is **DENIED**.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**